## STATEMENT OF ROBERTA BRITTINGHAM

I, Roberta Brittingham, declare as follows:

1.    I am over the age of 18 and make this declaration based on personal knowledge, and any referenced documents are true and accurate copies.

2.    Since I was a child, I have had a fascination with Kaleidoscopes. I used to gaze into them for hours and become hypnotized by their colors, geometry, and movement. I loved the idea that they are infinite and never repeat themselves.

3.    One day, when walking around Seattle, I saw an exhibition of Kaleidoscopes in one of my favorite stores. It was an exhibition by Michael Collier, a renowned kaleidoscope artist. I took several of them home. I was very happy. They were beautiful. After several days of viewing them, the idea came to me to film a kaleidoscope.

4.    I found Michael Collier and talked with him to find out if he had filmed any kaleidoscopes. He told me no, and to his knowledge he had never seen a kaleidoscope film with any quality. Some films he knew of were little clips, of very poor quality, filmed with a GoPro camera. And then there are digitized films that lack all the presence and true quality of a real kaleidoscope. So the desire in me to film a kaleidoscope in real time began.

5.    I knew Frank Pisciotti from him having worked for me several times in the past, and I respected his talent as an artist, photographer and film maker. I decided to approach him and commission him to film one of Michael Collier's kaleidoscopes, and Frank agreed.

6.    I worked with Michael Collier to create kaleidoscope object chambers that were unique for my intended project. The object chamber is the head of the kaleidoscope where the colored beads are placed. We ended up with four object chambers.

7.    For some time, Frank Pisciotti tried by various means to film the kaleidoscope to no avail. He needed specialized equipment. We agreed to use Oppenheimer studios in Seattle, where expert technicians could help. I paid for arrangements to rent the equipment necessary, including a specialized camera that is used in Hollywood called "Big Red." I worked with Frank while he was filming and paid for all the expenses including equipment and technical advice.

1

8. After Frank filmed at the Oppenheimer Studio, we continued the project by editing of the raw footage at Frank's personal studio in Yelm. There were three creators who worked on editing the raw footage to produce the final video/audio/packaging: Frank, Jose Maria Gutierrez ("Chema"), and me.

9. Chema and Frank were good friends over many years, and Chema—an artist in his own right—worked with Frank in previous years on various of my projects and those of others, for example with editing music for horse shows and video of the Ramtha world tour for Marjorie Layden. Chema worked on the Kaleidoscope video at Frank's studio in Yelm most afternoons while the process was going on, in total more than 10 times. While working on the video with Frank, Chema collaborated as a co-author in the editing of sound and visuals, as well as a creative assistant editor of music and sound based on our discussions and my insights and instructions on the project.

10. While editing with Chema's help, Frank communicated and consulted with me often, and I provided direction and instruction. During that timeframe, Frank would come to my house (I estimate at least 7 times) bringing edited samples of the 'video in progress, and we would view those samples together. During those sessions, I would make discernment regarding qualities of color, content, speed, etc. From those sessions, I would direct Frank in how to proceed with his work in correcting according to my own quality criteria. Frank never had the experience or overall vision for this project and would not have been able to make the Kaleidoscope video without extensive directive and valuable input from me and also through Chema. My Kaleidoscope project is very unique. It is not simply filming a Kaleidoscope object and adding music. The real creation is in editing the raw video and audio footage to obtain the correct color, speed, tempo and feeling needed to achieve the scientific phenomena associated with the meditative state of consciousness desired. Because this was my expertise, and that of Chema to a lesser extent, and Frank had no knowledge or experience in this regard, Frank was merely acting as a technician to manage what I was pressing to achieve for the projects based on my own tastes and perceptions. Frank could not perceive what was needed with regard to color, speed, getting the music to fit in, as well as qualities of the music itself. As with many occasions before (on many different projects), Frank welcomed

2

the input that Chema and I offered, and instituted those changes into the product. In this fashion, I was able to exercise my choice of using my criteria, not Frank's criteria, for injection of important artistic qualities, for decision making, and to approve the work as it progressed.

11.     As time went by, Frank and I had many meetings at my home to review his progress, and I continued to provide direction regarding editing and post-production work of both audio and video parts, which Frank would then perform. When the Kaleidoscope film was near completion, I was very pleased with the quality, the purity of the colors, the rhythm of the movement, but not with the speed. It was too fast. So we worked on that for a while until the flow and movement and speed were beautiful and coordinated. Since the purpose of the Kaleidoscope film is to attain a meditative state and allow the brain to enter into trance, it was very important that the rhythm and flow were coordinated together with a slow-synchronized speed that would be perfect. In this way, I would be able to achieve the effects that I always wanted and that coincided with the science of brain states that have become published. Frank had no ability to edit the raw video and audio footage to obtain this result, but was able to follow my instructions until it met my requirements.

12.     In addition to commissioning the Kaleidoscope objects used in the project, I provided or paid for virtually all equipment, studio and production expenses incurred in the production and post-production process. All this time, during the project, Frank was paid for his invoiced hours, as was the custom and understanding with all previous works we had done before. As he had in all projects Frank previously worked on for me, he understood and agreed to assign all his rights (as did Chema) to me as co-authors in the Kaleidoscope work in exchange for compensation previously or anticipated to be provided, including monetary and in-kind compensation (including lodging for an entire winter season at my property). Accordingly, no further allocation, accounting or compensation to Frank is required, including for any distribution of the work that occurred since 2014, and there was no agreement to pay Frank anything further.

13.     When we finished editing, knowing Frank's talent as a musician, I asked him to create the music for two 30 minute Kaleidoscope films; the two compositions being 30 minutes each. I named them "Aman" and "Anima." At first, during the writing of this music, Frank brought

samples of the music, which I flatly rejected as inappropriate for the video project. He had created something that was not of the feeling or speed that would work for what I was wanting to achieve. Eventually, by rewriting the music, he did rewrite new versions that then worked appropriately. While creating the music for the first film, Frank and I were in touch. He moved forward, always with my consultation, input, and approval, but when he started creating the music for the second film, Frank became unresponsive and did not communicate with me.

14.     My husband at the time, Joe Dispenza, saw one of the Kaleidoscope preview clips, and fell in love with their beauty. He wanted to use them for his students at his events. With the knowledge Joe had of the human brain, he recognized how the Kaleidoscope film had a very significant effect on brain waves. You can read this information in his book, "Becoming Supernatural."

15.     Since I had no success in communicating with Frank, I asked Joe to help me and communicate with Frank. Joe and Frank communicated back and forth and after a while, I received a DVD of the Kaleidoscope film. Joe then asked me to work with his brother John (a graphics artist) to design a cover/jacket for the DVD so that Joe could offer the Kaleidoscope DVD at his upcoming event.

16.     At all times Frank was aware that while I was planning on giving him film and music credits, I was the owner of all copyrights in the work. I notified Frank in a May 8, 2014 email that I would include credit for him for music and film on the inside cover of the DVD, but that it would bear my copyright notice.

17.     At all times I treated the work as owned exclusively by me, which it was. Initially I used Frank for making DVD copies. At Joe's request, and with my approval and direction, Frank had 300 DVD copies made for Encephalon, Joe's company. As Frank was well aware, since 2014, the Kaleidoscope DVD bearing my sole copyright notice ("©2014 Roberta Brittingham. All Rights Reserved"), has been marketed and sold via Joe's www.drjoedispensa.com website:

4



18.     In late 2014 or early 2015, I talked to Frank and expressed to him a desire for 300 more copies. Frank was again slow to respond. I then told him that I wanted to call the printing company and order them myself, but he refused to cooperate with me about this.

19.     On February 7, 2015, Frank sent Joe and I an email asking to receive 50% of the profits. This request came completely out of the blue, given that I had created, paid for and owned

the Kaleidoscope project, and that Frank had been fully compensated for his work. It was clear to everyone, just as it had been for years on various projects Frank had worked on for me, that he was hired to do a job—filming raw video footage and creating raw audio to be edited to my specifications for use in the project I created and paid for. He was never the owner of the product. By email dated February 16, 2015, I refused Frank's request for further compensation. In subsequent emails dated February 17 and February 18, we discussed trying to meet to address any issues, but that did not occur. By email dated March 5, 2015, at my direction and on my behalf, I had Joe notify Frank any continued relationship with him was over. In an effort to avoid future dispute, I offered to allow Frank to sell off any DVD copies of Kaleidoscope that he had, but that after that we were done, that I never wanted to work with Frank or see him again, or to have him on my property. Because I owned all rights to Kaleidoscope, I also demanded that Frank return all raw video footage and audio tracks for the project, which he never did. Unexpectedly Frank did bring me the final, finished rendition of the video on a hard drive a couple years later, but never the raw video footage and audio tracks to this day.

20.     Given that the Kaleidoscope production has always been my brainchild, creation, financial investment and production, and that Chema and Frank were only contributors thereto, it came as a significant surprise when I learned years later, via a July 20, 2020 letter from Frank, that he had nearly six years earlier, on or about March 18, 2015, surreptitiously filed for and obtained federal copyright protection for the Kaleidoscope work. This was a gross misrepresentation, given that it (1) incorrectly claimed exclusive authorship—failing to include Chema and me as co-authors; and (2) incorrectly identified Frank as the sole copyright owner and claimant—again failing to include Chema and me. As of this time, I am the sole owner and claimant of all copyright, as Chema has formally assigned his rights to me (as was the understanding and agreement from the beginning).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

EXECUTED on April ⎽⎽28⎽⎽, 2021 at ⎽⎽Monterrey⎽⎽ (city), ⎽⎽N.L> Mexico⎽⎽
(State/Country)

DocuSigned by:

*Roberta Brittingham*

849A17E2047E443...

Roberta Brittingham

7