UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FRANK PISCIOTTI,<br><br>                      Plaintiff,<br><br>        v.<br><br>ROBERTA BRITTINGHAM,<br><br>                      Defendant. | CASE NO. 20-CV-05924-LK<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff Frank Pisciotti's Motion for Partial Summary Judgment, Defendant and Counterclaimant Roberta Brittingham's Motion for Summary Judgment, and the parties' responsive pleadings and declarations in support of their motions. Dkt. Nos. 42–53. For the reasons discussed below, the Court denies Pisciotti's motion and grants in part and denies in part Brittingham's motion.

## I.        INTRODUCTION

This copyright case centers on "Kaleidoscope" (the "Work"), a film that, as its title suggests, pairs music with "shifting images of a rotating kaleidoscope viewed through a specialized 'snorkel' lens"—a combination intended to place viewers "into a trancelike meditative

state." Dkt. No. 1 at 2; Dkt. No. 42 at 4. The "gravamen of the dispute" between the parties is ownership of the Work. *Seven Arts Filmed Ent. Ltd. v. Content Media Corp., PLC*, 733 F.3d 1251, 1258 (9th Cir. 2013).

A "plain and express repudiation" of copyright ownership triggers a three-year statute of limitations, at least where, as here, the parties are in a close relationship. *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). This fact dooms Pisciotti's suit. By his own sworn admission, he knew that Brittingham claimed more rights in the Work than he believed she had by March 2015 at the latest. Although this knowledge incited Pisciotti to register the Work with the U.S. Copyright Office under his name, he did not otherwise pursue legal remedies. Pisciotti's ownership claim and—by extension—any infringement claims are therefore time-barred. *Seven Arts*, 733 F.3d at 1258. The Court recognizes that this result may appear harsh at first blush. But this case illustrates why a putative owner cannot "lie in the weeds for years after his claim has been repudiated, while large amounts of money are spent developing a market for the copyrighted material, and then pounce on the prize after it has been brought in by another's effort." *Zuill*, 80 F.3d at 1371.

This is not to say that Brittingham wins the day. As the ensuing discussion also makes clear, her counterclaim fails as a matter of law. For even assuming that this counterclaim is not time-barred as well, Brittingham is not a co-author of—and therefore does not co-own the copyright in—the Work. *See* 17 U.S.C. § 201(a). And Brittingham's strained efforts to suggest that copyright ownership was otherwise transferred to her by a signed, written agreement or by "operation of law" are simply unavailing. *See* 17 U.S.C. §§ 201(d)(1), 204(a). Now for the facts.

## II.     BACKGROUND

Pisciotti and Brittingham

Plaintiff Frank Pisciotti has done freelance production work for private individuals and corporate entities since at least the early 1990s. Dkt. No. 44-2 at 8:19.[1] Some of his past employers include PBS, CNN, and MTV. *Id.* at 8:18. He first met Roberta Brittingham in 1994 at a "horse show performance" in Tumwater, Washington. *Id.* at 15:46, 48. Pisciotti was apparently invited to serve in a directorial capacity, compiling several music tracks to go with the performance. *Id.* at 15:46–47 ("Basically I edited them together to create the program, and then using that during the performance. I directed the talent and the show, basically, and ran the—I was like a technical director, directing."); Dkt. No. 43-4 at 17. And he must have done something well, too, because Pisciotti served as a sound engineer and quasi-director on at least two of Brittingham's subsequent horse show films: *Dancing Andalusians* and *Spiritus Equus*. Dkt. No. 44-2 at 18:61; 19:62–63, 65; 20:67–69; *see also* Dkt. No. 43-4 at 15 (Pisciotti has "helped produce three more horse show events and participated in two smaller shows.").

At one point, Pisciotti was asked to take a three-hour "fantasy" photoshoot of Brittingham and two of her friends. Dkt. No. 44-2 at 18:58–59; Dkt. No. 43-4 at 17. He even compiled the audio program for Brittingham's wedding, where he and his band put on a live performance. Dkt. No. 43-4 at 17–18; Dkt. No. 44-2 at 22:77; 23:78. Beyond this, Pisciotti "contributed in some way" to collaborative art projects, installations, events, and parties that Brittingham organized or "[h]elped to sponsor" over the years, which entailed several overnight stays on her property. Dkt. No. 44-2 at 23:78–79, 81; 24:82–83; 72:274–75. There were never written agreements for these earlier projects, and Pisciotti provided equivocal testimony as to whether Brittingham paid him for

---

[1] For deposition citations, the Court references the ECF page number followed by the transcript page number. For example, this citation is to docket number 44-2, ECF page 8, deposition page 19.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 3

his work. *See* Dkt. No. 44-2 at 17:54; 18:60; 20:66–67; 21:70; 22:77; 24:82; *see also* Dkt. No. 43-4 at 16 ("Mr. Pisciotti has done work for Ms. Brittingham from time to time and has been compensated for some of that work[.]").

   The Creation of "Kaleidoscope"

   The seeds of this dispute took root sometime in October 2012, when Brittingham asked Pisciotti about "shoot[ing] inside of a kaleidoscope."[2] Dkt. No. 43-4 at 5; Dkt. No. 44-1 at 7:14, 16. According to Pisciotti, he agreed to the project but indicated that it would not be a work made for hire, and that he "would only take it on as his project." *Id.* Brittingham disagrees as to this last condition. She contends that, as with past projects, she "commission[ed]" Pisciotti to complete the Work. Dkt. No. 44-1 at 7:17; *id.* at 8:18 ("And it's always been my work, my conceptual property, and that's the way it's been all the time."). The parties do agree on one thing: Brittingham was to pay Pisciotti for his time. Dkt. No. 43-4 at 5; Dkt. No. 44-1 at 8:18; Dkt. No. 44-2 at 36:130. None of this was memorialized in writing. Dkt. No. 44-2 at 36:132.

   Roughly a year passed. During this time, Pisciotti experimented with digital kaleidoscope imagery and shot live footage. Dkt. No. 44-2 at 30:107–108. Jose Maria Gutierrez also began working with Pisciotti in late 2012 and continued to do so throughout 2013.[3] Dkt. No. 44-3 at 8:21; 9:22; Dkt. No. 44-1 at 10:27–29. Gutierrez lives on Brittingham's property rent-free, where he serves as security and cares for Brittingham's landscapes and animals (including 20 horses). Dkt. No. 44-3 at 12:42–43; 16:60–61. Prior to his tenure on Brittingham's property, Gutierrez was a creative director at a company in Mexico City, where he would write storyboards for television and radio commercials and direct the audio and video technicians. *Id.* at 7:17. Gutierrez testified

---

[2] The record indicates that Pisciotti and Brittingham had for months discussed the notion of filming a kaleidoscope before either of them acted on it. *See, e.g.*, Dkt. No. 44-2 at 35:129.

[3] Brittingham identifies three "creators" of the Work: herself, Pisciotti, and Gutierrez. Dkt. No. 24 at 2.

that he visited Pisciotti's home "twice a week for a long time" to do "the same job that [he] was doing in Mexico[.]"[4] Dkt. No. 44-3 at 8:21. Gutierrez counseled Pisciotti on what worked and what did not, which colors needed to be changed, and speed adjustments. *See id.* ("This is not working here. We've got to change the color. You've got to slow the speed. The music is not matching."). Gutierrez did not participate in the actual filming. Put differently, he did not manipulate the kaleidoscope or select the camera angles, directions, lighting, or frame rate. *Id.* at 9:23.

In the summer of 2013, Pisciotti obtained four kaleidoscopes manufactured by local artist Michael Collier for use in the Work.[5] Dkt. No. 44-2 at 30:108. Then, in September 2013, he exhibited the first "proof of concept" videos to Brittingham, who immediately approved continuation of the project. Dkt. No. 43-4 at 6. Pisciotti thereafter rented a probe lens and other camera equipment to begin shooting the Work in earnest. *Id.*; *see* Dkt. No. 44-2 at 31:111–13; 32:114–16.

The first two-day shoot occurred in October 2013. Dkt. No. 43-4 at 6. Pisciotti filmed for 10 hours on both days at the studio of his professional acquaintance and friend, Marty Oppenheimer. *Id.*; Dkt. No. 44-2 at 32:114, 116–17; 33:118. He worked alone during these two days, "turning the [kaleidoscope] object wheel by hand as well as creating lighting cues[.]" Dkt. No. 43-4 at 6; Dkt. No. 44-2 at 33:118–119. Brittingham did not attend this first shoot or otherwise provide guidance or input. Dkt. No. 44-1 at 8:21, 9:22. Although Brittingham subsidized the camera equipment and studio space, she concedes that she did not select the frame rate, camera angles, or camera direction that Pisciotti employed. Dkt. No. 43-4 at 7; Dkt. No. 44-2 at 33:119–

---

[4] Brittingham estimates that Gutierrez visited Pisciotti's studio "more than 10 times." Dkt. No. 24 at 2. Pisciotti wholesale denies that he ever worked with Gutierrez in any capacity on any portion of the Work. Dkt. No. 44-2 at 46:171–73. However, in his interrogatory answers, he states that Gutierrez visited his home studio to view the "final rendering" of the Work in late March 2014. Dkt. No. 43-4 at 11.

[5] Collier filled the "object chambers" of these kaleidoscopes with beads and a glycerin solution. Dkt. No. 44-1 at 25:131–32.

121; 34:122–123; Dkt. No. 44-1 9:22. Nor did Brittingham compose any of the music or sync that music with the footage. Dkt. No. 44-1 at 22–23. The only post-production "guidance" Brittingham provided with respect to the first-shoot footage was counseling Pisciotti on the speed and rhythm of the film. Dkt. No. 44-1 at 9:23–24 ("Frank came to me to show me, you know, clips, and I would guide him if I liked it, I didn't like it, it was too fast or too slow. It had to really fit for a meditative trance state."); Dkt. No. 24 at 2 ("I would make discernment regarding qualities of color, content, speed, etc. From those sessions, I would direct Frank in how to proceed with his work in correcting according to my own quality criteria.").

Gutierrez likewise pitched in to "giv[e] direction and editing for" the Work. Dkt. No. 44-3 at 18:70. He and Brittingham would view Pisciotti's clips and "make notes about what to change, colors, speed, music, everything."[6] *Id.* at 9:25. As with Brittingham, however, Gutierrez was not at the first shoot. *Id.* at 9:24. Nor did he have anything to do with the camera angle, lighting, equipment, or frame rate. *Id.* Indeed, Gutierrez testified that he did not edit the film files on the computer or compose any of the music. *Id.* at 10:27. The only thing that he did to sync the music and images was direct Pisciotti "to go slower or faster." *Id.*

In early December 2013, Pisciotti and Brittingham met to view footage and discuss "chapters sequence" and music. Dkt. No. 43-4 at 7. Brittingham "liked" the clips that Pisciotti showed her, particularly with respect to a technique called "staircasing." *Id.* She suggested that Pisciotti "slow transport further," an alteration Pisciotti cautioned against but agreed to implement via a software editing technique. *Id.*; *see also* Dkt. No. 44-2 at 39:142. Brittingham further suggested using Pisciotti's music for the Work. Dkt. No. 43-4 at 7. She wanted him to produce a demo track—music included—in time for an event in February 2014. *Id.* Brittingham's then-

---

[6] Gutierrez testified that he disposed of these notes shortly after the Work was completed. Dkt. No. 44-3 at 18:70–71.

husband, Joe Dispenza, was hosting the event in Arizona through his company, Encephalon. Dkt. No. 44-2 at 42:156, 52:195; Dkt. No. 24 at 4. Although Pisciotti was apparently concerned about this tight deadline because he "did not want to compromise quality," he eventually agreed to "create, produce, and record" the music as an "investment" in the Work and in exchange for an extra 15% of the sales. Dkt. No. 43-4 at 7; *see also* Dkt. No. 44-2 at 38:139. All told, Pisciotti logged more than 200 hours editing the Work by the end of January 2014.[7] Dkt. No. 43-4 at 7; Dkt. No. 44-2 at 39:145. Brittingham paid Pisciotti $2,300, which he now alleges was the "last payment" he ever received for his time on the Work.[8] Dkt. No. 43-4 at 8.

Pisciotti and Brittingham met to review an initial version of the Work in late January 2014. Dkt. No. 43-4 at 8. Although the record is unclear as to the precise feedback Pisciotti received, Brittingham suggests that she was displeased with the product. The record is equivocal even with respect to this assertion, however. *Compare* Dkt. No. 44-1 at 11:35 ("I wasn't . . . happy with the results of the first shooting. It didn't meet my idea of the conceptual art that I wanted to achieve, so we talked about shooting again."), *with* Dkt. No. 24 at 3 ("I was very pleased with the quality, the purity of the colors, the rhythm of the movement, but not with the speed. It was too fast."). Pisciotti attributes the need for a re-shoot to Brittingham's previous request to slow the "transport speed." Dkt. No. 43-4 at 8; Dkt. No. 44-2 at 40:146 ("[I]t actually looked pretty good the first time, . . . [b]ut using a high-speed camera with the fastest frame rate could make it smoother."). In any event, they agreed to a second two-day shoot, and Pisciotti again rented the requisite equipment from Oppenheimer. Dkt. No. 43-4 at 8–9. This time he acquired a "high-speed camera of sorts" so that he could "shoot more frames per second" to achieve the speed that Brittingham desired. Dkt.

---

[7] Pisciotti alleges that he accrued $10,000 in labor during this time. Dkt. No. 43-4 at 8–9.

[8] Brittingham paid Pisciotti's November 2013 invoice for $3,775, which included 25 hours of pre-production work at $35 per hour; 19 hours of production work at $100 per hour; and 10 hours of post-production work at $100 per hour. Dkt. No. 44-2 at 37:135–36.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 7

No. 44-2 at 39:143–44. Pisciotti also rented a "RED" camera. *Id.* at 39:144.

Brittingham attended one day of the re-shoot. Dkt. No. 44-1 at 11:37; Dkt. No. 43-4 at 9. According to her testimony, she stayed for "hours," Dkt. No. 44-1 at 11:37, and wanted to see the technical aspects of filming because she had never been to the studio before.[9] Dkt. No. 44-1 at 12:38; *id.* at 12:40 ("I just went to check it out and to see how he was filming, and I was curious to see what kind of a setup he used."). Although Brittingham again covered the equipment rental and studio fees, she did not aid or direct Pisciotti during filming in any way.[10] Dkt. No. 44-1 at 12:39; Dkt. No. 44-2 at 45:167–69, 46:170. She did not set up the equipment, manipulate the kaleidoscope, or select the camera angles, lighting, or frame rate. Dkt. No. 44-1 at 12:39. By Pisciotti's account, he played several of his music tracks for Brittingham, showed some fractured footage from the shoot, and that was it. Dkt. No. 44-2 at 45:167–69. Brittingham thereafter "wrapped it up and left." *Id.* at 45:168. Pisciotti vehemently denies that Brittingham or Gutierrez took any part in filming or editing the raw footage from the second shoot. *Id.* at 46:171–73.

The "Kaleidoscope" Demo Debuts in Arizona; Finalization

Pisciotti delivered a demo version of the Work to Brittingham around mid-February 2014, in time for her to showcase it at the aforementioned event in Arizona.[11] Dkt. No. 43-4 at 9; Dkt.

---

[9] Oppenheimer contradicts Brittingham's claim that she stayed for an extended period. According to him, Brittingham was "not there" because she "flew in with a small entourage and flew back out again," and was "not actively . . . involved in any of what was going on." Dkt. No. 44-1 at 12:41 (internal quotation marks omitted). Pisciotti's testimony differs from both Brittingham's and Oppenheimer's. He claims that Brittingham arrived alone. Dkt. No. 44-2 at 45:167. But as with Oppenheimer's testimony, Pisciotti suggests that Brittingham's time at the studio was relatively short. *See id.* at 45:168.

[10] In her sworn declaration, Brittingham asserts that she "provided or paid for virtually all equipment," including "studio and production expenses incurred in the production and post-production process." Dkt. No. 24 at 3. She likewise claims to have paid all of Pisciotti's invoiced hours. *Id.* Pisciotti, on the other hand, contends that Brittingham has not fully paid him for his labor on the Work. *See, e.g.*, Dkt. No. 43-4 at 8. The record shows that Brittingham paid Pisciotti approximately $7,500 total. Dkt. No. 44-2 at 59:224–25.

[11] Pisciotti alleges that this was the second demo of the Work that he produced. Dkt. No. 44-2 at 42:154. According to Pisciotti, he first published the Work in December 2013, when he provided an initial demo to Brittingham. *Id.* The record is unclear as to the precise circumstances of the exchange. Even if true, this contention has no bearing on a material issue in this case.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 8

No. 44-2 at 41:152 ("So basically two weeks after that shoot, I had put the music together and the video."). Pisciotti testified that the purpose of this pre-release of sorts was to "drum up" sales. Dkt. No. 44-2 at 41:152–53 (cleaned up). The record suggests that the demo enjoyed at least moderate success. Brittingham texted Pisciotti that the demo was "very well received by the participants of the event" and "everyone loved the trance." Dkt. No. 43-4 at 10; Dkt. 44-2 at 41:153 ("Roberta had texted me, you know, saying how much the crowd loved it and, you know, your artwork is so beautiful, and things like that."). Attendees allegedly pre-ordered between 600 and 650 copies of the Work. Dkt. No. 43-4 at 10; Dkt. No. 44-2 at 41:153. According to Pisciotti, the prospect of revenue from these sales convinced him to move forward with the project. Dkt. No. 44-2 at 41:153.

Despite this successful debut, a fair amount of editing remained to produce a finalized version of the Work. *See* Dkt. No. 44-2 at 50:188 ("The DVD was not the end piece. The end— that was a demo sort of—of where I was at, both music and video."); *id.* at 50:189 ("That was not a finished piece, and me coming to a deadline with finished work to hand over to have them sell DVDs. That's just not what it was."). Pisciotti claims that he "logged over 350 hours editing, compositing, [and] color grading" the Work between late January and mid-July 2014. Dkt. No. 43-4 at 10. He apparently met with Brittingham to review footage only "[o]nce or twice" during this period because she was in Mexico for seven weeks. Dkt. No. 44-2 at 50:189; Dkt. No. 43-4 at 10. The parties nonetheless discussed edits over the phone while Brittingham was away, and Pisciotti met with Joe Dispenza to choose the music for one chapter of the Work. Dkt. No. 43-4 at 10; *see, e.g.*, *id.* at 11 (Brittingham called in April 2014 to propose changes to the color selections in chapters one and two). The Work was 90% complete by mid-March 2014. *Id.* at 11.

In early May 2014, Pisciotti and Brittingham met for an extended period to review, discuss, and choose footage for the second track of music in chapter two of the Work. *Id.* Brittingham also informed Pisciotti that she and Joe Dispenza wanted the Work completed in time for a show in

Mexico in August 2014. Dkt. No. 44-2 at 52:196–97. According to Pisciotti, it was here that the parties agreed to attribute the film and music to him and, more importantly, mark all copies of the Work with a copyright in his name. Dkt. No. 43-4 at 11; Dkt. No. 44-2 at 55:207.[12] Brittingham was responsible for planning and printing cover art for the Work—a task that she outsourced to John Dispenza, her husband's brother. Dkt. No. 43-4 at 11; *see* Dkt. No. 44-2 at 52:197, 53:198, 54:203.

Pisciotti spent the better part of the next two months creating yet another track of music at Brittingham's request. Dkt. No. 43-4 at 11–12. Then, in a final three-week period, he placed the finishing touches on the Work.[13] Dkt. No. 43-4 at 12.

The Relationship Sours

In July 2014, Pisciotti ordered 300 copies of the Work from Spiritborne Productions and delivered them to Brittingham's house. Dkt. No. 43-4 at 12; Dkt. No. 44-2 at 57:215–16, 58:221. Printed on the face of these discs was the following: "©2014 pisciotti." Dkt. No. 1 at 3; *see also* Dkt. No. 44-2 at 78:298–301, 79:302. This was a pivotal moment. After receiving the discs, Brittingham presented Pisciotti with the jacket cover for the Work. Dkt. No. 43-4 at 12; Dkt. No. 44-2 at 58:218–19. The cover credited Michael Collier with creation of the kaleidoscope featured in the film; credited Pisciotti with creation of the music and film; and listed Brittingham as the sole owner of the copyright. *See* Dkt. No. 46-1 at 252 ("©2014 Roberta Brittingham"); Dkt. No. 44-2 at 58:219; Dkt. 43-4 at 12.

The parties provide divergent accounts of what happened next. According to Pisciotti, he

---

[12] In a May 8, 2014 email to Pisciotti, Brittingham indicated that she had "talked to John about including on the inside cover[:] music and film by Frank Pisciotti. And the copyright." Dkt. No. 43-14 at 3. Brittingham further stated that they were "all set to replicate." *Id.*

[13] Pisciotti contends that the Work was never a finished product. Dkt. No. 44-2 at 52:197. Rather, he was pressed to have "something presentable" for the August 2014 event in Mexico. *Id.*

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 10

emphatically told Brittingham that she could not list herself as holder of the copyright in his work. Dkt. No. 44-2 at 58:219. He further claims that Brittingham simply smiled in response to his assertion. *Id.* at 58:221. Brittingham, on the other hand, suggests that Pisciotti never even claimed copyright ownership to begin with. Dkt. No. 44-1 at 16:61, 17:72–73. And when she showed Pisciotti the jacket cover with her name next to the copyright mark, Pisciotti allegedly said "that he liked it," and "didn't say anything" specifically about the copyright. Dkt. No. 44-1 at 20:83.

The August 2014 event in Mexico came and went. Brittingham sold all 300 copies of the Work there, and Pisciotti "asked to be paid" upon her return. Dkt. No. 44-2 at 60:226; Dkt. No. 43-4 at 12. He maintains that Brittingham was supposed to pay him "with the disc sales," but failed to do so because of other alleged "expenses."[14] Dkt. No. 44-2 at 57:217, 58:218, 60:226. Pisciotti's testimony with respect to this topic is confusing. For example, it is unclear whether the payment he sought was tied to unsubsidized production costs, compensation for his time, or an independent entitlement to the profits as royalties, although the latter two are the more likely candidates given his own admission that Brittingham fully reimbursed him for the production costs associated with the 300 discs. Dkt. No. 44-2 at 57:216; *see also* Dkt. No. 44-2 at 62:237 ("Those weren't expenses. That was time. The $30,000 was for my time[.]").

In fact, Brittingham paid Pisciotti more than what she owed him for production costs. The record indicates that she wrote him a check for $1,350—an amount intended to cover production expenses for 1,000 copies of the Work. Dkt. No. 44-2 at 59:223. Pisciotti readily admits, however, that he never placed the order for the remaining 700 copies. Dkt. No. 44-2 at 59:223. Nor did he return to Brittingham the balance of the $1,350. *Id.* And Pisciotti thereafter refused to place the order unless Brittingham paid him. *See id.* at 60:226–27 ("I said, [w]ell, Roberta, pay me. Pay me

---

[14] Pisciotti believes that Brittingham sold the first 300 copies of the Work at $40 each, for a total of $12,000. Dkt. No. 43-4 at 13.

for what we've done."); *id.* at 60:227 ("I didn't produce the 700 discs without being paid.").

A "few weeks" after Brittingham returned from the event in Mexico, Joe Dispenza called Pisciotti purporting to speak on her behalf. Dkt. No. 43-4 at 13. Dispenza told Pisciotti "that the idea for the Kaleidoscope project was Brittingham's intellectual property" and that Pisciotti "was like [a] ghost writer[.]" *Id.* In response, Pisciotti "reaffirmed his claim as sole author and copyright owner" and suggested that Dispenza research copyright law. *Id.* He contends that he never heard back from Dispenza. *Id.* Pisciotti also claims that he later viewed an event on YouTube in which Dispenza commented that he could not sell downloads of the Work "because of copyright law[.]"[15] Dkt. No. 43-4 at 13. This allegedly led Pisciotti to believe that Dispenza reviewed the "copyright code" and "realized that Pisciotti is the copyright owner." *Id.*

<u>Things Get Ugly; Pisciotti Files for Copyright Registration</u>

Despite all this, Brittingham expressed interest in "put[ting] some ideas down on paper." Dkt. No. 44-2 at 60:227; Dkt. No. 43-4 at 13. Pisciotti did just that. Dkt. No. 44-2 at 60:227–28; Dkt. No. 43-4 at 13. In a February 2015 email to Brittingham, he proposed ordering 1,300 additional copies of the Work from Spiritborne Productions. Dkt. No. 44-2 at 60:229; Dkt. No. 46-1 at 254. He also asked for a $30,000 cash payment "for work completed," and suggested that Brittingham use the sales from "the first 600 discs to cover the majority of this expense (300 discs already sold – and the next 300 discs sold)." Dkt. No. 46-1 at 254. Pisciotti last proposed that the parties "split 50-50" the "balance" of the remaining 1,000 copies and "all sales thereafter[.]"[16] Dkt. No. 46-1 at 254. Brittingham rejected this proposal. *See id.* at 196 ("Joe and I reviewed your offer

---

[15] Pisciotti testified that this happened "sometime" in 2015 or 2016. Dkt. No. 44-2 at 64:243. It is unclear, however, whether Pisciotti viewed the recording for the first time in 2015-16, or whether that is when the event occurred.

[16] Pisciotti's March 9, 2022 supplemental answer to Interrogatory No. 3 sheds light on the logic of his proposal. He reasoned that future sales from 1,300 additional copies of the Work, when combined with sales from the 300 original copies (1,600 discs total at $40 each), would net a sum of $64,000. Dkt. No. 43-4 at 13. And, once offset by the $30,000 Pisciotti believed Brittingham owed him for "hours logged" producing the Work, there would remain $34,000 to split evenly. *Id.* Pisciotti further suggested splitting evenly all future sales of the Work. *Id.*

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 12

and we don't agree, let's think it over."). Pisciotti responded the next day, *id.* at 197, and in reply Brittingham indicated that Joe Dispenza was out of town but offered to continue discussions when he returned. *Id.* at 198. This was the last amicable email that the parties exchanged.

On March 5, 2015, Joe Dispenza authored an email "on behalf of Roberta in reference to finalizing the [K]aleidoscope[.]" *Id.* at 224. There Dispenza excoriated Pisciotti for allegedly failing to tell Brittingham he charged by the hour, failing to communicate with Brittingham regarding his progress and hours worked, and continuing to work on the project "without any concern for the budget[.]" *Id.* Dispenza also disputed the veracity of Pisciotti's claim to $30,000. *See id.* ("I am uncertain as to how you personally have come up with that figure."). The email concludes with an "offer" to Pisciotti: "[s]ince [Roberta] never wants to work with you, see you again, or have you on her property, I think it is fair to just have you sell the DVD to whomever you chose [sic] and keep the profits and for her to do the same." *Id.* Brittingham also wanted "all of the footage that [w]as recorded delivered to her asap." *Id.* If Pisciotti responded to this email, it is not in the record. He claims that he saw Brittingham "sometime after" receiving the email and again "asked to be paid." Dkt. No. 44-2 at 61:233. He also told her that "she couldn't have a product—it couldn't be a product until [he] was paid," and that he "didn't agree with all of this." *Id.* The record suggests, however, that this communication did not occur until "some months" after the March 5th email—possibly not until December 2015. *Id.* at 62:234.

Something else happened in the meantime. On March 18, 2015—just days after Dispenza's email—Pisciotti filed for copyright registration of the Work. *Id.* at 66:250–51; *see* U.S. Copyright Reg. PA0001958265. In his application, Pisciotti claimed to be the sole author and owner of the copyright. Dkt. No. 44-2 at 66:252–53. He never notified Brittingham of the registration. *Id.* at 66:253, 67:254.

Several months passed. As noted above, Pisciotti contacted Brittingham sometime in

December 2015 asking to be paid for the Work. And although Brittingham again indicated that she could not pay Pisciotti, he still delivered to her home the original hard drive containing raw footage of the Work. Dkt. No. 44-2 at 62:234–36; *see also* Dkt. No. 46-1 at 256–59. Pisciotti claims that he did this because he did not want Brittingham "to feel like [he] withheld the footage," and he hoped that she would "appreciate the work that [he] did to produce the piece." Dkt. No. 44-2 at 62:236; *see also id.* at 62:237 ("It wasn't just to surrender my work or any[thing] like that[.]"). According to Pisciotti, he was not concerned about Brittingham making copies of the Work because the media files on the hard drive "have the copyright written into" them. *Id.* at 62:236–37. Brittingham tells a slightly different story. She contends that she asked Pisciotti for the hard drive "many times," and that he "came unannounced one day and just left [her] the hard drive." Dkt. No. 44-1 at 20:84. Brittingham then turned it over to an Encephalon "tech person," who downloaded the files and used them to make copies of the Work. *Id.* at 20:84–85, 21:86–87. The December 2015 meeting was the last time the parties saw or spoke to each other for almost five years. Dkt. No. 44-2 at 64:245, 65:246.

Dispenza avers that he has marketed and sold copies of the Work "bearing Roberta's sole copyright notice" since 2014 via the Encephalon website. Dkt. No. 46-1 at 223; *see also* Dkt. No. 45 at 9. Pisciotti disputes this. He "had a sense" in 2016 that Brittingham and Dispenza were displaying the Work at events and other seminars after at least one woman who saw the Work contacted him to compliment the music and video, but he denies that Encephalon sold the Work on its website until 2019. Dkt. No. 44-2 at 64:243–44. Pisciotti does not indicate how frequently he checked Encephalon's website between 2014 and 2019—only that he "looked a couple times" and "went to the website again" in August 2019 after a professional acquaintance informed him that Encephalon was selling the Work. *Id.* at 63:240, 64:244; Dkt. No. 43-4 at 14. He swears, though, that Encephalon did not advertise the Work "until after 2017." Dkt. No. 44-2 at 64:242.

1    Pisciotti Sues

2        In September 2020, Pisciotti sued Brittingham for (1) copyright infringement and

3    (2) removal or alteration of copyright management information in violation of the Digital

4    Millennium Copyright Act ("DMCA"). Dkt. No. 1 at 6–8; *see* 17 U.S.C. §§ 501(a)–(b), 1202(a)–

5    (b). Brittingham counterclaimed for a declaratory judgment naming her "co-author and sole owner

6    of the Kaleidoscope copyright work[.]" Dkt. No. 10 at 6; *see* 28 U.S.C. § 2201. After the close of

7    discovery, the parties filed competing motions for summary judgment. Pisciotti moved for partial

8    summary judgment on two issues: copyright ownership and infringement. Dkt. No. 42 at 1, 22–

9    23. He left for trial his DMCA claim as well as damages. *Id.* at 22. Brittingham also moved for

10   summary judgment on the issues of copyright ownership and infringement, arguing that Pisciotti's

11   claims are barred under the statute of limitations and, alternatively, by principles of equitable

12   estoppel. Dkt. No. 45 at 5, 27. Brittingham further argues that, in any event, Pisciotti is not entitled

13   to statutory or actual damages, wrongful profits, or attorney fees. Dkt. No. 45 at 5, 27. And, like

14   Pisciotti, Brittingham left a claim for trial: her declaratory judgment action. *Id.* at 27.

15              **III.    DISCUSSION**

16        Pisciotti's infringement claim is time-barred by the three-year statute of limitations.

17   Brittingham is therefore entitled to summary judgment on that issue and on Pisciotti's related

18   DMCA claim.[17] And Pisciotti is entitled to summary judgment against Brittingham on her

19   counterclaim that she is a co-author and owns the Work because Brittingham cannot establish that

20   she owns the Work and has not shown a dispute of material fact that she or Gutierrez contributed

21   anything copyrightable to the Work.

22

23   ---
     [17] To the extent Brittingham's summary judgment motion does not encompass this claim, the Court exercises its
     gatekeeping authority under Federal Rule of Civil Procedure 56 to dismiss it. *See Buckingham v. United States*, 998

24   F.2d 735, 742 (9th Cir. 1993) (a district court may sua sponte enter summary judgment if there is no genuine dispute
     respecting a material fact essential to the claim at issue).

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN
PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 15

1

### A.      Summary Judgment Standard

2

Summary judgment is appropriate only when "the movant shows that there is no genuine

3

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4

Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

5

stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

6

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

7

sided that one party must prevail as a matter of law." *Id.* at 251–52.

8

A court presented with cross-motions for summary judgment should review each motion

9

separately, giving the nonmoving party for each motion the benefit of all reasonable inferences

10

from the record. *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780,

11

786 (9th Cir. 2008). To the extent that the Court resolves factual issues in favor of the nonmoving

12

party, this is true "only in the sense that, where the facts specifically averred by that party

13

contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l*

14

*Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

15

The Court will, however, enter summary judgment "against a party who fails to make a

16

showing sufficient to establish the existence of an element essential to that party's case, and on

17

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

18

(1986). Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must

19

come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*

20

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e))

21

(emphasis omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific

22

affidavits, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to "scour the record in search of a

23

triable issue of fact"; rather, the nonmoving party must "identify with reasonable particularity the

24

evidence that precludes summary judgment." *Kennan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

1    (internal quotation marks and citation omitted); *accord Carmen v. San Francisco Unified Sch.*

2    *Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

3    **B.    Inadmissible Declarations**

4    When ruling on a motion for summary judgment, "a trial court can only consider admissible

5    evidence." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Declarations must be

6    signed and certified as true under penalty of perjury. *See* 28 U.S.C. § 1746. To be admissible, the

7    statute requires that the declaration be made "substantially" in the following language: "I declare

8    (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed

9    on (date)." 28 U.S.C. § 1746(2); *see also Commodity Futures Trading Comm'n v. Topworth Int'l,*

10   *Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999). The purpose of this affirmation is to be certain that "the

11   declarant understands the legal significance of the declarant's statements and the potential for

12   punishment if the declarant lies." *United States v. Bueno-Vargas*, 383 F.3d 1104, 1111 (9th Cir.

13   2004).

14   The declaration of Roberta Brittingham, Dkt. No. 50 at 1, does not substantially comply

15   with 28 U.S.C. § 1746 because it fails to contain a certification under penalty of perjury or a

16   statement that it is true. Nor does she state that her declaration is based on personal knowledge, as

17   required by Federal Rule of Civil Procedure 56(c)(4).[18]

18   Frank Pisciotti's declaration, Dkt. No. 43, also does not contain a certification under

19   penalty of perjury. Although Pisciotti's declaration states that he "make[s] this declaration on

20   personal knowledge and confirm[s] that any exhibits hereto are true and accurate copies of the

21   referenced documents," and that he "can testify to these matters below if called to testify regarding

22

---

23   [18] Jose Maria Gutierrez's declaration, Dkt. No. 51 at 1, does include a certification under penalty of perjury, but does
     not state that it is made on personal knowledge. However, because the declaration states that "the forgoing [sic] is true
24   and correct" and attests to the personal experiences of Mr. Gutierrez, the Court finds that it is admissible under Rule
     56(c)(4). *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990).

the same," *id.* at 1, these statements are not "substantially" in the form required under 28 U.S.C. § 1746.[19] *See In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2nd Cir. 2013) ("Inclusion of the language 'under penalty of perjury' is an integral requirement of the statute for the very reason that it impresses upon the declarant the specific punishment to which he or she is subjected for certifying to false statements"); *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306–07 (5th Cir. 1988) (purported affidavit omitting certification under penalty of perjury "allows the affiant to circumvent the penalties for perjury"); *Kersting v. United States*, 865 F. Supp. 669, 676 (D. Haw. 1994) (declaration is sufficient under section 1746 if it "contains the phrase 'under penalty of perjury' and states that the document is true").

Accordingly, the Court declines to consider these declarations on summary judgment. *See, e.g.*, *Carter v. Boeing Co.*, No. C15-1486-RSM, 2016 WL 4595164, at *1 (W.D. Wash. Sept. 2, 2016) (declining to consider on summary judgment a declaration lacking certification under penalty of perjury and any statement that it was true or based on personal knowledge); *Hoffman v. PennyMac Holdings, LLC*, No. C17-1062-JLR, 2018 WL 6448779, at *3 (W.D. Wash. Dec. 10, 2018) (striking declarations stating only that the contents were "true and correct to the best of [declarants'] knowledge, information and belief"); *Davenport v. Bd. of Trs. of the State Ctr. Cmty. Coll. Dist.*, 654 F. Supp. 2d 1073, 1083 (E.D. Cal. 2009) (striking declarations stating only that declarant had "personal knowledge of the facts"). The Court notes, however, that the inadmissibility of the declarations is inconsequential, as the inadmissible content is largely included elsewhere in the record in admissible form.

## C.    The Statute of Limitations: Ownership Versus Infringement

Brittingham argues that Pisciotti's infringement claim is time-barred under the Copyright

---

[19] There is one exception. Exhibit D to Pisciotti's declaration does contain a certification under penalty of perjury, Dkt. No. 43-4 at 20, and is therefore admissible.

Act's three-year statute of limitations because the gravamen of this case is ownership, and his ownership claim accrued over three years before he filed this lawsuit. Dkt. No. 45 at 15–19; Dkt. No. 48 at 17–21. Pisciotti obviously disagrees. According to him, Brittingham's counterclaim does not convert his "ordinary" infringement claim into one about ownership. Dkt. No. 47 at 13–14. Pisciotti points to the four corners of his complaint in support of his contention that his claims "are entirely about Brittingham's infringement[.]" *Id.* at 5–6. He also emphasizes the fact that his claim is for "sole ownership" of the copyright and "has nothing to do with co-ownership." *Id.* at 13–14.

"For ordinary claims of copyright infringement, each new infringing act causes a new claim to accrue," *Seven Arts*, 733 F.3d at 1254, meaning that an infringement action "may be brought for all acts that accrued within the three years preceding the filing of the suit," *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994); *see* 17 U.S.C. § 507(b). The Ninth Circuit, however, distinguishes between "infringement" claims and "ownership" claims. "'[C]laims of co-ownership, as distinct from claims of infringement,' accrue only once, 'when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation.'" *Seven Arts*, 733 F.3d at 1254 (quoting *Zuill*, 80 F.3d at 1369). And, as particularly relevant here, "an untimely ownership claim will bar a claim for copyright infringement where the gravamen of the dispute is ownership, at least where . . . the parties are in a close relationship." *Seven Arts*, 733 F.3d at 1258; *accord Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389–90 (6th Cir. 2007) ("When claims for both infringement and ownership are alleged, the infringement claim is timely only if the corresponding ownership claim is also timely.").

### 1.   The Gravamen of this Dispute is Ownership

Pisciotti's strategic efforts to evade or otherwise gloss over the issue of ownership are unavailing. *See, e.g.*, Dkt No. 47 at 15 ("Pisciotti's complaint assumes throughout that the

copyright in the Work is entirely his. He does not seek a declaration that Brittingham is not the owner or co-owner. He does not even bother alleging that Brittingham does not own the copyright in the Work."). The Ninth Circuit expressly recognized the danger of "allow[ing] plaintiffs who claim to be owners, but who are time-barred from pursuing their ownership claims forthrightly, simply to restyle their claims as 'infringement' and proceed without restriction." *Seven Arts*, 733 F.3d at 1255.[20]

This is not to suggest that every infringement action *turns* on ownership. "In the ordinary infringement case, ownership is not in dispute; rather, the dispute centers on the second prong—whether, for example, the copying was a 'fair use,' or whether the materials taken were 'original[.]'" *Seven Arts*, 733 F.3d at 1254 (internal citation and footnote omitted). But here ownership is the dispositive issue. Brittingham concedes she is exploiting the Work yet denies that Pisciotti owns the copyright. Dkt. No. 45 at 16; Dkt. No. 48 at 18. This is the hallmark of the infringement-versus-ownership distinction. *See, e.g.*, *Seven Arts*, 733 F.3d at 1254 ("Paramount concedes it is exploiting the pictures, but denies that Seven Arts owns the copyrights."); *Abbas v. Vertical Ent., LLC*, 854 Fed. Appx. 816, 819 (9th Cir. 2021) (ownership was "gravamen" of plaintiff's claim because defendants "admitted that they distributed [the film], but defended their purportedly infringing acts by contending that [plaintiff] is not the owner of the film"). Nor does Pisciotti's claim of sole ownership as opposed to co-ownership alter the outcome. The Ninth Circuit has dismissed this as a "distinction without a difference." *Seven Arts*, 733 F.3d at 1255; *see*

---

[20] Pisciotti correctly asserts that his registration of the Work is prima facie evidence of ownership. Dkt. No. 42 at 21; *see* 17 U.S.C. § 410(c) (registration "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate"); *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021). But valid registration does not resurrect an otherwise untimely ownership claim. *See Silva v. Sunich*, No. C03-9327-GPS, 2006 WL 6116645, at *2, 8 (C.D. Cal. Sept. 6, 2006) (plaintiff's ownership claim was time-barred under the statute of limitations even though he possessed valid Certificate of Registration). Moreover, valid registration is not a precondition for copyright protection; rather, it is a prerequisite to bringing an infringement suit. *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1144 (9th Cir. 2019); 17 U.S.C. §§ 408(a), 411(a).

*also Zahedi v. Miramax, LLC*, C20-4512-DMG, 2021 WL 6882408, at \*6 n.9 (C.D. Cal. Nov. 24, 2021).

Thus, although Brittingham's counterclaim does not "convert" Pisciotti's infringement action into an ownership claim, the validity of his infringement action turns on whether he owns the copyright—a fact that is in dispute regardless of Brittingham's counterclaim. *See Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 54 F. Supp. 3d 1001, 1009 (S.D. Ind. 2014) (ownership was the "dispositive issue" because the validity of plaintiff's claim "turn[ed] on which party [was] the owner of the copyrighted materials"). Pisciotti's complaint also makes clear that ownership is the controlling issue in this case. *See* Dkt. No. 1 at 6 ("Ms. Brittingham's repeated claim of being the copyright owner is false."). And in his motion for partial summary judgment, he identifies the "central issue in this case" as "ownership of the copyright in 'Kaleidoscope[.]'" *Id.* at 4; *see also id.* at 22 ("[I]f this Court rules that Pisciotti owns the copyright to the Kaleidoscope Work, it should also rule that Brittingham infringed that copyright.").

Because the gravamen of this dispute is ownership, the statute of limitations bars Pisciotti's infringement claim if (1) he and Brittingham were in a close relationship; and (2) Brittingham plainly and expressly repudiated his copyright ownership before September 16, 2017, *i.e.*, more than three years before he filed this action. *See Zahedi*, 2021 WL 6882408, at \*6.

2.    Pisciotti and Brittingham Were in a Close Relationship

Pisciotti does not directly dispute this first prong. *See* Dkt. No. 53 at 10–11 (addressing only express repudiation). Nor could he. The parties had an amicable, quasi-professional relationship for over twenty years. Pisciotti worked at horse shows and on various art projects for Brittingham since the mid-1990s. He stayed on Brittingham's property at least a handful of times and even played the keyboard at her wedding. Indeed, Pisciotti was filming another project for Brittingham when she approached him about creating the Work. The undisputed facts further

establish that Brittingham subsidized production costs and participated in the editing process. And finally, Pisciotti knew that Brittingham planned to display and sell at least the first 300 copies of the Work at an Encephalon event. *See Zahedi*, 2021 WL 6882408, at *7 (close relationship existed where plaintiff "had a prior business relationship and at least a verbal agreement with" defendant, took the photograph at defendant's request, and granted defendant "a limited license to use it").

The purpose of the close relationship requirement also makes clear that this prong is satisfied. The Ninth Circuit's hesitancy to impose *Zuill*'s accrual rule absent a close relationship was "based on issues of notice." *N.K. Collins, LLC v. William Grant & Sons, Inc.*, 472 F. Supp. 3d 806, 840 (D. Haw. 2020). The court feared that blind extension of *Zuill* "could introduce uncertainty into the enforcement of copyrights and require copyright holders to file suit against any third party that might be deemed to have repudiated the copyright owner's title." *Seven Arts*, 733 F.3d at 1256. That concern is absent here. Brittingham is simply not the type of unknown third party who could claim copyright ownership of the Work and exploit it without notice to Pisciotti. *See id.* ("We need not decide which rule applies to suits against *unknown* third parties." (emphasis added)). Put differently, Pisciotti cannot "claim ignorance about [Brittingham's] interest in, and distribution of, the [Work] during the statutory period." *Id.* at 1257. He knew, as discussed at length below, that Brittingham claimed at least some ownership interest in the Work. And despite his dubious arguments to the contrary, the record reveals that Pisciotti knew of Brittingham's plans to display, market, and sell the Work. The parties' relationship was sufficiently close for purposes of the first prong of the accrual test.

### 3.   Brittingham Plainly and Expressly Repudiated Pisciotti's Copyright Ownership

The second prong of the accrual test is likewise satisfied. "There is no comprehensive list of the types of statements or activities that constitute 'plain and express repudiation[.]'" *Ford v.*

1   *Ray*, 130 F. Supp. 3d 1358, 1361 (W.D. Wash. 2015); *accord Moi v. Chihuly Studio, Inc.*, No.

2   C17-0853-RSL, 2019 WL 2548511, at *5 (W.D. Wash. June 20, 2019). The inquiry is "fact-

3   intensive," *Donen v. Paramount Pictures Corp.*, No. C08-03383-DDP, 2008 WL 5054340, at *5

4   (Nov. 20, 2008), and the "purported repudiation should be an act that is adverse to the party whose

5   ownership is being repudiated," *Zahedi*, 2021 WL 6882408, at *7. One form of express repudiation

6   is written notice. *Zuill*, 80 F.3d at 1368. Another is failing to give credit to the putative owner,

7   *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000), or refusing to pay them royalties,

8   *Seven Arts*, 733 F.3d at 1257. The dispositive question, however, is always whether repudiation

9   was "communicated to the claimant." *Zuill*, 80 F.3d at 1369.

10      Brittingham points to a series of events that she claims establishes plain and express

11   repudiation of Pisciotti's copyright ownership. The Court addresses each in turn. First, Brittingham

12   contends that her May 8, 2014 email "claim[ed]" copyright ownership of the Work. Dkt. No. 52

13   at 7. As noted above, this email informed Pisciotti that Brittingham had "talked to John [Dispenza]

14   about including on the inside cover[:] music and film by Frank Pisciotti. And the copyright." Dkt.

15   No. 46-1 at 249. This is a far cry from the type of written notice required for repudiation. As the

16   phrase suggests, the communication must be "plain and express"—meaning that there is no room

17   for divergent interpretations. *See Zuill*, 80 F.3d at 1368 (written agreement emphatically stated that

18   plaintiff's company was "the sole owner and copyright holder" of the work). A reasonable person

19   could read Brittingham's email to mean that the cover would credit Pisciotti with the music, film,

20   "[a]nd the copyright." Dkt. No. 46-1 at 249. Indeed, the record indicates that Pisciotti at best found

21   the email "ambiguous." Dkt. No. 44-2 at 56:210.

22      But it is generally downhill from here for Pisciotti. Next up is his July 2014 delivery of the

23   300 copies to Brittingham's home. Dkt. No. 52 at 7. The undisputed facts make clear that

24   Brittingham presented the disc jacket to Pisciotti during this delivery, and that the inside cover

1    attributed the copyright solely to Brittingham, while crediting Pisciotti with the film and music.

2    *Cf. Ford*, 130 F. Supp. 3d at 1361 (album cover and disc face did not acknowledge plaintiff as an

3    author and credited him only with lesser contributions). As set forth above, the parties offer

4    divergent accounts of Pisciotti's response. He alleges that he immediately rejected Brittingham's

5    attempt to claim copyright ownership. And, at least according to Pisciotti, Brittingham simply

6    smiled at him in return.

7    The Court assumes this is true for purposes of summary judgment. Although Brittingham's

8    response might have been strange, it did not leave open the question of Pisciotti's *sole* ownership

9    of the copyright. Brittingham's presentation of the jacket cover made clear that she was claiming

10   at least some ownership interest. At minimum, this was a clear and express act "adverse" to

11   Pisciotti's ownership. *Zahedi*, 2021 WL 6882408, at \*7. And even if Brittingham subsequently

12   entertained negotiations over profit distribution and payment to Pisciotti, she never backtracked

13   on her assertion of ownership or otherwise left open for discussion Pisciotti's claim of *sole*

14   ownership. *See Aalmuhammed*, 202 F.3d at 1231 (trier of fact could find that "question of

15   authorship [was] left open for further discussion" where plaintiff claimed credit as a screenwriter

16   and, although the producer told plaintiff that there was nothing he could do for him, the producer

17   also indicated that they could "discuss it further at some point"); *Robertson v. Burdon*, No. C18-

18   00397-JAK, 2019 WL 2141971, at \*13−14 (C.D. Cal. Apr. 3, 2019) (defendant's repudiation of

19   plaintiff's co-ownership was not sufficiently "clear and express" to dismiss complaint where

20   plaintiff "confronted" defendant about co-ownership of songs, plaintiff was "initially rebuffed" by

21   defendant, and the parties had subsequent "inconclusive" discussions).

22   Subsequent events resolved any lingering doubts as to Brittingham's claim to ownership.

23   Pisciotti testified that he did not create the 300 discs as a "gift" for Brittingham. Indeed, he

24   expected to receive royalties from the sales. *See* Dkt. No. 44-2 at 67:256 ("I didn't make the copies

for Roberta. I didn't give her 300 copies to gift to her. They were made for me. I was looking to sell the discs. That was my whole intent was to sell the work that I had done."). Yet Pisciotti concedes that he knew Brittingham sold these copies at the Encephalon event in Mexico—copies bearing her copyright notice on the jacket cover—and never paid him a dime in royalties despite incessant requests for payment. *See, e.g.*, Dkt. No. 44-2 at 63:241 ("I knew that she printed it on that cover[.]"); Dkt. No. 1 at 3 ("In fact, she did not share any of the proceeds she received from the sales that she made at the conference."). This was a form of express repudiation.[21] *See Silva v. Sunich*, No. C03-9327-GPS, 2006 WL 6116645, at *6–7 (C.D. Cal Sept. 6, 2006) (plaintiff knew that defendants were selling products bearing the image of his animated character yet conceded that he was never paid any royalties in connection with the sales of those products); *Brown v. MOJO Recs.*, NO. C00-286-ST, 2000 WL 33223398, at *10 (D. Or. Apr. 6, 2000) (express refusal to pay royalties to the alleged co-owner is a form of repudiation).

Brittingham thereafter made clear that she planned to market and sell additional copies of the Work without paying Pisciotti profits or royalties. Which segues into the next event relied on by Brittingham: Joe Dispenza's March 5, 2015 email to Pisciotti. Dkt. No. 46-1 at 224. It is important to first recall the antecedent communications leading up to that email. Namely, Dispenza's phone call to Pisciotti just weeks after the Mexico event, during which he claimed "that the idea for the Kaleidoscope project was Brittingham's intellectual property[.]" Dkt. No. 43-4 at 13. Equally significant is Pisciotti's February 7, 2015 email to Brittingham proposing payment of

---

[21] Pisciotti suggests that he granted Brittingham a limited license to distribute the initial 300 copies of the Work at the Encephalon event in Mexico, a limited license that he subsequently revoked in December 2015 when he delivered the hard drive to Brittingham. Dkt. No. 1 at 3, ¶ 10; Dkt. No. 47 at 8; Dkt. No. 53 at 11; *see also Corbello v. DeVito*, 777 F.3d 1058, 1067–68 (9th Cir. 2015) (discussing the factors a court considers when determining the existence of an implied license). Even if this is true, it changes nothing with respect to when his copyright ownership claim accrued, *i.e.*, when Brittingham plainly and expressly repudiated his claim of sole ownership. Pisciotti still expected to receive proceeds from the sales—license or not—and he never received those proceeds. Moreover, the 300 copies sold pursuant to the purported limited license bore Brittingham's copyright notice.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 25

$30,000 "for work completed[.]" Dkt. No. 46-1 at 254. As particularly relevant here, Pisciotti suggested that Brittingham use the sales from the first 300 copies to partially pay him. *Id.* He also proposed ordering 1,300 additional copies and splitting future sales. *Id.* Brittingham rejected this "offer" but indicated that the parties could talk when Dispenza returned from a trip. Dkt. No. 44-2 at 60:229; 61:231. Dispenza's March 5th email put an end to Pisciotti's hope for any payment. More importantly, however, it also made clear that Brittingham planned to sell copies of the Work and "keep the profits[.]" Dkt. No. 46-1 at 224 ("I think it is fair to just have you sell the DVD to whomever you cho[o]se and keep the profits and for her to do the same.").

The final indicia of express repudiation that Brittingham points to is Encephalon's alleged marketing and sale of the Work on its website since 2014. Dkt. No. 52 at 7. Although Brittingham casts this as undisputed, Pisciotti's deposition testimony makes clear that there is an issue of fact with respect to exactly when Encephalon began selling copies. *See* Dkt. No. 44-2 at 63:239–41, 64:242–44.[22] But this does not alter the outcome. Notwithstanding Pisciotti's knowledge of sales between 2014 and 2019, his sworn deposition testimony makes clear that, at least as of March 2015, he understood Brittingham's actions and representations as a repudiation of his sole copyright ownership. *See Zahedi*, 2021 WL 6882408, at *8 (plaintiff had "actual knowledge" of plain and express repudiation because he understood the defendant's actions as such).

A brief cataloguing of his testimony is instructive. And it illustrates why this case "implicates several of the policy justifications for imposing a statute of limitations." *Id.* at *9. For starters, Pisciotti admitted that he filed for copyright registration in March 2015 because he knew that Brittingham was claiming copyright ownership: "I wasn't paid for the work, and Roberta was

---

[22] The Court also notes that many of Brittingham's citations are either incorrect or do not support the cited proposition. In addition, by including almost all her citations in footnotes, Brittingham violated this Court's Standing Order for All Civil Cases, §B.1.a ("Citations . . . must be included in the body of the briefing – the Court does not allow citations in footnotes or endnotes, with the exceptions of citations for explanatory and supplemental information."). Future violations of the Standing Order will result in sanctions.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 26

assuming copyright. And so I couldn't let that stand. I didn't want to let that stand. I was not letting go of all that work that I'd put into this piece." Dkt. No. 44-2 at 65:248. Despite this, though, Pisciotti elected not to bring suit to enforce his ownership claim. He apparently did not think that the payoff was worth the time or effort. In Pisciotti's words, he "didn't think it was going much further than . . . showing it at the events," and he "couldn't see how it would be worth it for [him] to pursue it with just, you know, kind of performance royalties[.]" *Id.* Pisciotti repeatedly returned to this in some variation throughout his testimony. At one point he attributed his inaction to his alleged belief that the Work was not "a finished piece" and therefore not "that sellable really[.]" *Id.* at 63:239. Then, at other points, he claimed to be ignorant of the Work's success.[23] *See id.* at 63:239 ("I don't know if it was that big of a deal, really. I thought it was cool, but I didn't know how it was hitting over there at the events. So I wasn't really concerned in that way."). This is the type of wait-in-the-weeds behavior that *Zuill*'s accrual rule seeks to eradicate. *See* 80 F.3d at 1370–71; *Silva*, 2006 WL 6116645, at *6 ("[E]ven if the subject matter of the putative joint ownership may ultimately prove without value, a party wishing to preserve its future option to collect royalties must file the suit within the limitation period.'" (cleaned up)).

And there's more. Pisciotti consulted an attorney as early as Spring 2014. Dkt. No. 44-2 at 65:246. Although counsel offered to send a cease-and-desist letter to Brittingham, Pisciotti elected not to pursue legal action because, once again, the juice was not worth the squeeze in his eyes: "[A]t the time, I didn't do it. I don't recall exactly what it was. Some of it was financial, but—and I wasn't really sure that it was really something worthy to pursue." *Id.* at 65:247. Pisciotti was willing to live with Brittingham's exploitation of the initial 300 copies without compensation

---

[23] Other portions of Pisciotti's deposition testimony bely his claim of ignorance, at least with respect to the Work's popularity. *See, e.g.*, Dkt. No. 44-2 at 63:241 ("I was expecting her to sell the 300 copies, because there were 600 copies in presales. Over 600. It was getting closer to a thousand by the time the event happened. And I'm sure after the event, there was even more of a demand.").

because he "didn't know if it was that big [of] a hit." *Id.* Indeed, he admitted to putting off the issue "for a few years" because he figured he would "work [it] out" later: "[S]o I figured 300 discs, okay, sort of write it off, and when I have the time, I'll get back into the project and finish it and work that out. And so I put it on the back burner for a few years. That's how it went." *Id.*[24] But that is not how copyright works. The Sixth and Ninth Circuits have likened repudiation of copyright ownership to adverse possession. *See Everly v. Everly*, 958 F.3d 442, 451 (6th Cir. 2020) ("Repudiation in this copyright context resembles the doctrine of adverse possession in real property." (cleaned up)); *Zuill*, 80 F.3d at 1370 ("Copyright, like real estate, lasts a long time, so stability of title has great economic importance."). And as with adverse possession, a putative owner cannot sleep on his rights. The policy concerns underpinning copyright law compel this conclusion. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989) ("Congress' paramount goal in revising the 1976 Act [was] enhancing predictability and certainty of copyright ownership.").

The upshot is clear. Whether Pisciotti did not consider the Work a marketable product, or whether he felt that protecting his rights were not worth the money, time, or effort, he understood in March 2015 at the latest that Brittingham "claimed more rights in the [Work] than [he] believed [she] had." *Zahedi*, 2021 WL 6882408, at *8. His infringement claim and, by extension, his DMCA claim[25] are therefore barred by the statute of limitations. The Court need not reach Brittingham's

---

[24] "A few years" ended up being five to six years. From the time Pisciotti first talked to the attorney in 2014, his copyright claims stayed "on the back burner" until "the end of 2019 until 2020," when he and the attorney "work[ed] out what the best approach could be and how we should do it." *Id.* at 65:247.

[25] Pisciotti's DMCA claim fails as a matter of law because it too turns on his time-barred ownership claim. Pisciotti claims that the information Brittingham provided (and continues to provide) on copies of the Work is false because he—rather than she—is the sole owner of the copyright. *See* Dkt. No. 1 at 8 ("Ms. Brittingham . . . removed his copyright management information from the 'Kaleidoscope' DVDs . . . and falsely claimed . . . that she owns the copyright" on the copies she distributed and on "sales web pages[.]"). Therefore, Pisciotti's DMCA claims necessarily implicate ownership of the copyright in the Work. *See Lievano v. CoinTelegraph Media USA Inc.*, No. 21-CV-03255-LGS-SDA, 2021 WL 5532513, at *2 (S.D.N.Y. Nov. 2, 2021) ("[T]he DMCA prohibits the addition of copyright

alternative arguments about equitable estoppel, damages, and attorney fees.

### D.    Brittingham's Counterclaim

This leaves Brittingham's counterclaim for declaratory judgment that she is "a co-author and sole owner" of the Work. Dkt. No. 10 at 6. This claim fails as a matter of law.

As a threshold matter, the Court notes that Brittingham's co-authorship and ownership claims likely accrued more than three years before she filed her counterclaim. *See Zuill,* 80 F.3d at 1371; *Aalmuhammed*, 202 F.3d at 1230. But even assuming that they are not time-barred, Brittingham's counterclaim fails because neither she nor Gutierrez is a co-author of the Work. Nor does she otherwise own the copyright. Brittingham nonetheless maintains that, at minimum, there are disputes of fact as to whether (1) she and Gutierrez are co-authors; (2) "Kaleidoscope" is a work made for hire; and (3) copyright ownership was transferred to her. Dkt. No. 48 at 21. The Court disagrees.

### 1.    Neither Brittingham Nor Gutierrez Is a Co-Author of the Work

No reasonable juror could find that Brittingham and Gutierrez are co-authors of "Kaleidoscope" as a joint work. The Copyright Act defines a "joint work" as one "prepared by

---

information that falsely represents the ownership of the copyright[.]"). Similarly, whether Brittingham removed or altered copyright management information without the authority of the copyright owner requires identification of the owner whose authority was flouted—which, according to the allegations of his complaint, is Pisciotti. *See* Dkt. No. 1 at 8 ("Ms. Brittingham . . . removed and/or altered Mr. Pisciotti's copyright management information [and] distributed infringing 'Kaleidoscope' copies knowing that Mr. Pisciotti's copyright management information had been removed or altered without authority of Mr. Pisciotti or the law[.]").

Finally, Pisciotti must establish that he owns the copyright in the Work to prove that he was injured by Brittingham's alleged section 1202 violations. *See* 17 U.S.C. § 1203(a). The Court does not mean to suggest that only copyright owners have standing to bring DMCA claims. *See Echostar Satellite, L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201, 1205 (S.D. Cal. 2008). But Pisciotti's complaint makes clear that, at least in this case, whether he was injured turns on confirmation of his ownership. And the DMCA does not provide an alternate, indirect means of adjudicating time-barred ownership rights. *See Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1025 (9th Cir. 2019) (the DMCA is part of Title 17 and therefore subject to the same three-year statute of limitations as copyright infringement claims). Indeed, such an inconsistency undercuts the Copyright Act's bedrock goal of enhancing certainty in copyright ownership. *Reid*, 490 U.S. at 749; *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1318 (Fed. Cir. 2005) ("[T]he DMCA must be read in the context of the Copyright Act[.]"). The Court grants summary judgment against Pisciotti on this claim.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 29

two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. As a threshold matter, a joint work requires each purported author to make "an independently copyrightable contribution." *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990). Neither Brittingham nor Gutierrez did so.[26]

For a contribution to be independently copyrightable, it must be "original" and "fixed in [a] tangible medium of expression[.]" 17 U.S.C. § 102(a). Originality requires the contribution to be independently created (as opposed to copied from another work) and possess "some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). And a contribution is "fixed" when it is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101; *see also Reid*, 490 U.S. at 737 (an author is someone who "translates an idea into a fixed, tangible expression"). Equally important here, though, are those things that are not copyrightable: namely, ideas and concepts.[27] 17 U.S.C. § 102(b). This is so "regardless of the form in which [they are] described, explained, illustrated, or embodied" in a work. *Id.* "These limitations, along with the need to 'fix' a work in a 'tangible medium of expression,' have often led courts to say, in shorthand form, that . . . copyrights protect 'expression' but not the 'ideas' that lie behind it."

---

[26] As indicated, this is a threshold requirement for establishing co-authorship. Even when an individual "contribute[s] substantially" to a work, it does not necessarily render him or her an author. *See Aalmuhammed*, 202 F.3d at 1232–36. In determining authorship, a court must further evaluate whether (1) there were objective manifestations of a shared intent to be co-authors; (2) the putative co-author superintended the work by exercising control; and (3) the work's appeal is attributable to both authors such that the share of each in its success cannot be appraised. *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008) (citing *Aalmuhammed*, 202 F.3d at 1234). The Court need not delve into these three criteria because neither Brittingham nor Gutierrez made an independently copyrightable contribution to the Work. Thus, while Brittingham makes much of her purported superintendence or control over the Work, Dkt. No. 48 at 22, this argument sprints past the dispositive threshold inquiry. Brittingham's related argument about objective manifestations of shared intent misses the mark for the same reason. *Id.* at 23.

[27] The parties expend a fair deal of effort laying claim to the "idea" behind the Work. *Compare* Dkt. No. 44-2 at 25:88–89, 26:90, *with* Dkt. No. 24 at 1, *and* Dkt. No. 44-1 at 6:13, 7:14, 12:40. Brittingham in particular repeatedly emphasizes that the Work was her "brainchild"—an allegedly novel creation born from her life-long infatuation with kaleidoscopes. Dkt. No. 24 at 1, 6.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 30

1   *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021); *see also Golan v. Holder*, 565 U.S.

2   302, 328 (2012) (discussing the idea/expression dichotomy).

3       Brittingham marshals a series of arguments in an ill-fated attempt to conjure up an

4   independently copyrightable contribution. In her view, the evidence "clearly establishes" that she

5   and Gutierrez "were intimately involved in the creation of the subject (including kaleidoscope

6   object, position and speed), presentation (including camera direction and lighting), [and]

7   organization and layout, including the direction, editing and post-production work of both audio

8   and video parts[.]" Dkt. No. 48 at 22. Brittingham further alleges that she and Gutierrez "directed

9   technical production of the video and audio track, and organized and arranged them in a manner

10  that accomplished the meditation production purposes." *Id.*

11      The parties' sworn deposition testimony tells a different story. *See, e.g.*, Dkt. No. 44-1 at

12  11:34 (Brittingham admitting that she "had no idea" how to put her idea for the Work "into some

13  sort of tangible form of that expression" because she is "not a technician"). For starters, neither

14  Brittingham nor Gutierrez participated in the production process whatsoever. Gutierrez did not go

15  to either shoot and Brittingham visited only the second shoot for a few hours at most, where she

16  toured the set and sampled a few music tracks. Dkt. No. 44-1 at 8:21, 9:22, 11:37, 12:38; Dkt. No.

17  44-2 at 45:167–68; Dkt. No. 44-3 at 9:24. And, in any event, both admitted that they had nothing

18  to do with filming, directing, or otherwise arranging the lighting, camera angle, or equipment at

19  either shoot. Dkt. No. 44-1 at 12:39, 22–23; Dkt. No. 44-3 at 9:24. Nor did they compose or arrange

20  any of the music. Dkt. No. 44-1 at 22–23; Dkt. No. 44-3 at 10:27. Indeed, they lacked the technical

21  skill to do so. *See* Dkt. No. 44-1 at 6:11–13; 11:34; Dkt. No. 44-3 at 6:12–13, 7:14–16.

22      As for the editing process, Brittingham and Gutierrez offer only vague, generalized

23  descriptions of their feedback to Pisciotti. *See, e.g.*, Dkt No. 44-1 at 9:24 ("Frank came to me to

24  show me, you know, clips, and I would guide him if I liked it, I didn't like it, it was too fast or too

slow."); Dkt. No. 44-3 at 8:21 ("This is not working here. We've got to change the color. You've got to slow the speed. The music is not matching. This is not what we want."). The Court assumes for purposes of summary judgment that Brittingham and Gutierrez did in fact offer direction on the music, footage, and frame speed. It likewise accepts as true their contention that they selected certain footage and music to better achieve a meditative state. *See* Dkt. No. 44-1 at 14:51 ("Frank decided what samples to send us, but we were the ones choosing which ones we wanted."). Even so, these are not copyrightable contributions. *See S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086-87 (9th Cir. 1989) (manager who "told . . . programmers what tasks the software was to perform and how it was to sort data" but "did none of the coding and d[id] not understand computer language" was not a co-author because "one must supply more than mere direction or ideas" and cannot "merely describ[e] to an author what the commissioned work should do or look like"); *Gaylord v. United States*, 595 F.3d 1364, 1379 (Fed. Cir. 2010) (a party's contribution of "direction and ideas" "did not rise to the level necessary for a joint work"); *Heger v. Kiki Tree Pictures, Inc.*, No. CV-17-03810-SJO, 2017 WL 5714517, at *6 (C.D. Cal. July 24, 2017) (plaintiff's coaching, advice, review of footage, and coordination and direction of scenes, which he alleged "create[d] the experience of the film and ensure[d] dramatic and spectacular visual and audio effects," lacked fixation and were therefore not copyrightable).

Beyond generalized feedback, Brittingham and Gutierrez point to the special skills they developed at Ramtha's School of Enlightenment.[28] *See* Dkt. No. 44-1 at 9:24; Dkt. No. 44-3 at 10:29. And they repeatedly quantify their contributions to the Work in terms of their experience and creative expertise in inducing a meditative state. *See, e.g.*, Dkt. No. 44-1 at 9:23 ("[T]he conceptual art part is that it's done for meditation purposes, and so in all my time of being very

---

[28] The Court notes, however, that Pisciotti was also involved in Ramtha's School of Enlightenment. Dkt. No. 44-3 at 10:29, 11:30.

1   knowledgeable about kaleidoscopes, I knew that rhythm and the, you know, tempo and the speed

2   to provoke a meditative state, what you call a trance state."); *Id.* at 16:60 (Brittingham describing

3   her contribution as her "ideas," "conceptual art, "decisions," and "everything that took place in

4   order for [her] to come to this conclusion"); Dkt. No. 24 at 2 (Brittingham claiming that the "real

5   creation is in editing the raw video and audio footage to obtain the correct color, speed, tempo,

6   and feeling needed to achieve the scientific phenomena associated with the meditative state of

7   consciousness desired"). The Court has little doubt that these contributions were key to developing

8   the Work. But like ideas, specialized knowledge and experience are simply not the province of

9   copyright. *See Aalmuhammed*, 202 F.3d at 1231 (although "substantial and valuable," plaintiff's

10   technical, scholarly, and creative help was not copyrightable).

11        Pisciotti produced every second of both the music and footage that forms the Work. *See*

12   Dkt. No. 44-2 at 46:173, 47:174, 49:183–85, 50:186. Although Brittingham and Gutierrez offered

13   feedback or directed him to make specific changes, Pisciotti was the one to implement those edits

14   in accordance with his professional skill and creative judgment. It should be clear by now that

15   neither Brittingham nor Gutierrez fixed any idea in a tangible medium of expression. This

16   forecloses their claim of co-authorship. *See Garcia v. Google, Inc.*, 786 F.3d 733, 744 (9th Cir.

17   2015) (plaintiff was not an author because she "played no role in fixation"). And because

18   Brittingham and Gutierrez are not co-authors of the Work, they do not co-own the copyright. *See*

19   17 U.S.C. § 201(a).

20             2.   "Kaleidoscope" Is Not a Work Made for Hire

21        Brittingham next attempts to establish her copyright ownership by suggesting that

22   "Kaleidoscope" is a work made for hire. *See* 17 U.S.C. § 201(b); Dkt. No. 45 at 7; Dkt. No. 48 at

23   6–7, 14, 21, 26. But she does nothing to advance this argument beyond conclusory, passing

24   references to a "work-for-hire arrangement"—one that, according to Brittingham, was entered into

1    "verbally up front." Dkt. No. 45 at 7.

2          The Copyright Act "plainly creates two distinct ways in which a work can be deemed for

3    hire: one for works prepared by employees, the other for those specially ordered or commissioned

4    works which fall within one of the nine enumerated categories and are the subject of a written

5    agreement." *Reid*, 490 U.S. at 741; *see* 17 U.S.C. § 101(2) (listing the nine types of work that can

6    be made for hire with a written agreement). "Kaleidoscope" does not qualify as a work made for

7    hire under either of these "mutually exclusive" theories. *Reid*, 490 U.S. at 743. First, Brittingham

8    makes no effort to argue that Pisciotti was her employee. Nor would such an attempt be persuasive.

9    *See id.* at 751–52 (listing factors relevant to determining whether a hired party is an employee).

10   And second, although "Kaleidoscope" is an "audiovisual work" (one of the nine enumerated

11   categories), the parties did not "expressly agree in a written instrument signed by them that the

12   work shall be considered a work made for hire." 17 U.S.C. § 101(2).

13                    3.    <u>Copyright Ownership Was Not Otherwise Transferred to Brittingham</u>

14         Brittingham's third and final effort to establish copyright ownership in the Work fares no

15   better than the first two. She alleges that Pisciotti orally agreed to transfer his rights at the outset

16   of the project and that Gutierrez's "*nunc pro tunc* written copyright assignment of his coauthor

17   copyrights to [her] memorializ[ed] this earlier oral assignment[.]" Dkt. No. 48 at 26–27; *see*

18   *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th Cir. 1996) ("[U]nder some circumstances

19   a prior oral grant that is confirmed by a later writing becomes valid as of the time of the oral

20   grant[.]").

21         "A transfer of copyright ownership, other than by operation of law, is not valid unless an

22   instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed[.]" 17

23   U.S.C. § 204(a); *see also DC-3 Ent. LLLP v. John Galt Ent., Inc.*, No. C04-2374C, 2005 WL

24   8172481, at *1 (W.D. Wash. Mar. 16, 2005) (even valid oral agreements do not constitute transfer

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN
PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 34

"by operation of law"). Section 204's written requirement "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). Although Brittingham correctly cites *Magnuson* for the proposition that oral transfer agreements can in "some circumstances" be validated by subsequent writings, 85 F.3d at 1428, here there is no subsequent writing that validates Pisciotti's alleged prior oral agreement. Brittingham points to Gutierrez's October 2020 nunc pro tunc copyright assignment, in which he "confirms the earlier transfer and assignment" of his copyrights in the Work to Brittingham. *See* Dkt. No. 46-1 at 294. As explained above, however, Gutierrez is no more a co-author or co-owner of the copyright than Brittingham. His purported transfer does not validate or confirm copyrights that he never had. Nor can it have any effect on Pisciotti's copyrights in the Work, as it is not signed by Pisciotti. *See* 17 U.S.C. § 204(a).[29]

The Court grants summary judgment against Brittingham on this claim.

## IV.   CONCLUSION

For the reasons discussed above, the Court DENIES Pisciotti's Motion for Partial Summary Judgment and GRANTS IN PART and DENIES IN PART Brittingham's Motion for Summary Judgment. Dkt. Nos. 42, 45.

---

[29] Brittingham's allusion to state law is unavailing as well. Dkt. No. 48 at 22 (citing *Goodness Films, LLC v. TV One, LLC*, No. C12-8688-GW(JEMX), 2013 WL 12145508, at *9 (C.D. Cal. Feb. 28, 2013)). The statute of limitations for an oral or implied contract claim in Washington State is three years. Wash. Rev. Code § 4.16.080(3). Brittingham alleges that Pisciotti orally assigned his rights sometime before 2016, more than three years before this lawsuit was filed. *See, e.g.*, Dkt. No. 45 at 7 (stating that the "work-for-hire arrangement" was entered into "verbally up front"); *id.* at 11 ("[T]he last time [Pisciotti] ever spoke to Ms. Brittingham about her ongoing use was when he delivered to Ms. Brittingham the requested DVD media files at 'the end of 2015.'").

Dated this 1st day of July, 2022.

Lauren King
United States District Judge